**Ivette SOTO–OCASIO, Plaintiff, Appellant,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant, Appellee.**

No. 97–2280.

United States Court of Appeals, First Circuit.

Heard Feb. 23, 1998.

Decided July 16, 1998.

Federico Lora López for appellant.

Vivian Nuñez, with whom Luis D. Ortiz Abreu and Goldman, Antonetti & Cordova were on brief, for appellee.

Before TORRUELLA, Chief Judge, SELYA and STAHL, Circuit Judges.

STAHL, Circuit Judge.

Plaintiff-appellant Ivette Soto–Ocasio ("Soto") appeals the district court's grant of summary judgment to defendant Federal Express Corp. ("Federal Express" or "the company"). Plaintiff had claimed that Federal Express failed to provide a reasonable accommodation to her known physical limitations, in violation of the Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. §§ 12101–12117, and Puerto Rico law. We affirm.

I.

The following facts are undisputed. In June 1988 plaintiff began working for Federal Express as a full-time operations agent at its Borinquen Station Office ("BSO") in Aguadilla, Puerto Rico. The purpose of the operations agent position as set forth in a job description dated March 11, 1988, was to "perform routine administrative/clerical duties necessary for efficient field operations." These duties included entering data into the company's computer, composing letters and memoranda, reviewing reports for accuracy, ordering supplies, typing and filing various forms and papers, processing bills, maintaining personnel data, and auditing air bills. Plaintiff was the only operations agent in the Aguadilla office, although three cus-

tomer service agents and twenty-five couriers also worked there.

To carry out her duties, plaintiff would arrive at work at 6:00 a.m. From 6:00 a.m. until 7:00 a.m., she would enter data from employees' time cards into a computer. She would then begin her filing and ordering duties, as well as continue her data entry duties, which required that she enter into a computer data from each of the previous day's "hubs" left in a tray for her. Hubs are air bills which contain each customer's account number, the sender's and recipient's names and addresses, and other pertinent information. On any given day, she would enter 80 to 375 hubs into the system, a task which, on some days, required that she work overtime, until 4:00 or 5:00 p.m., because company policy required that hubs be entered by the end of the next business day. During the day, she would take a single one-hour break.

On March 7, 1993, plaintiff was involved in a car accident during non-working hours. Her physician, Dr. Hiram Luigi, diagnosed her as having a cervical sprain with myofacial pain, which is pain due to damage in the muscles in the trapezius and cervical areas of the body. After exhausting her allotted sick leave, plaintiff took additional leave pursuant to Federal Express's short term disability plan, which allowed her to receive benefits for an additional twenty-six weeks. On September 9, 1993, plaintiff applied for long-term disability benefits under Federal Express's disability insurance policy. Two months later, John Hancock Mutual Life Insurance Company ("John Hancock"), Federal Express's insurance carrier, approved the application. Subsequently, plaintiff suffered a period of depression and was hospitalized from February 23 until March 13, 1994, at a psychiatric hospital in San Juan.

On March 24, 1994, Dr. Luigi, who had last examined plaintiff in mid-January 1994, filled out a medical release form at plaintiff's request. He did not reexamine plaintiff prior to signing the release, on which he wrote the words, "patient light duty." Because Federal Express's BSO operations manager, George Franqui, was on vacation at the time, plaintiff submitted the medical certificate to senior manager Craig Connors, who rejected the certificate and refused to permit her to return to work, expressing doubts about the meaning of "light duty." On April 4, plaintiff obtained a second release (again without an examination) from Dr. Luigi, this one describing her limitations as follows: "Work 2 hours and rest 10 minutes. Cannot lift more than 7 pounds. Patient must be in treatment." In his deposition, Dr. Luigi testified that, at the time he completed the second release, he did not know the nature of plaintiff's occupation. Plaintiff presented the second certificate to Franqui, who accepted it and told her that he would give her a work schedule.

Notwithstanding his initial receptiveness, Franqui stated in a letter to plaintiff, dated May 10, that she would not be allowed to return to work until she had obtained medical certification that she was able "to resume all of [her] responsibilities" and "to work without restrictions." He further stated that "[i]n order to maintain operational efficiency and service to our customers it is necessary that I take steps to replace you in your position." In regard to the decision to replace plaintiff, Franqui testified that

> I initially thought that she would be able to return back to work, after consulting with Personnel. We wanted to have more specific information of her restrictions. So I initially did tell her that I was going to give her a work schedule but it was just until we could get a[sic] feedback from our doctor. Based on the medical leave of absence policy for anybody who has been out for an extended period of time before reinstating that person we have to send them, that person, to be seen by one of our doctors.

There is no evidence, however, that, prior to May 10, Federal Express raised its concerns about plaintiff's medical release forms either to Dr. Luigi or to its own medical personnel.

Plaintiff responded to Franqui's letter on May 12, expressing willingness to be examined by a physician designated by Federal Express, and requesting reasonable accommodation. She also sought permission to participate in Federal Express's "Temporary Return to Work" ("TRW") program, and an

evaluation of her case by the company's Human Capital Management ("HCM") Committee. A month later, on June 14, Connors asked Dr. Leonel Shub to examine plaintiff "to determine if she is physically able to return to her full duties in Federal Express." After the examination, Dr. Shub reported to Connors that, in his opinion, plaintiff was "not physically capable of performing the essential functions of her job given her present condition." He stated that her condition did not permit her to lift, push, or pull more than ten pounds; sit or stand for more than 45 minutes at a time; climb stairs repetitively; perform jobs that require cervical flexion—"the motion of chin to chest"—"of more than 25 for more than 30 consecutive minutes;"[1] or elevate her hands above her shoulders. He concluded that "[s]hould there exist a reasonable accomodation [sic] which complies with these restrictions, it is recommended that she return to work on a gradual basis starting with a 4 hours [sic] part time job." Federal Express did not provide a copy of the report to plaintiff or discuss it with her. Based on the restrictions that Dr. Shub outlined, Franqui, Connors, and senior personnel representative Lynn Busler decided not to reinstate plaintiff and instead referred plaintiff's case to the HCM Committee as plaintiff had requested. The three decisionmakers disregarded plaintiff's request to participate in the TRW program, purportedly on the basis that it was not available to Puerto Rico employees. Meanwhile, on June 24, 1994, plaintiff filed a charge of employment discrimination under the ADA with the Equal Employment Opportunity Commission.

The HCM Committee met on August 31, 1994, and, in a memorandum to Franqui, stated that it required "additional medical information regarding the date Ms. Soto will be fully released to return to work." It thus instructed Franqui to contact Dr. Shub for

this information, stating that, in the event that Dr. Shub needed to reexamine plaintiff, Franqui should have plaintiff set up an appointment with Dr. Shub for that purpose. Finally, the committee determined that if plaintiff would be able to return to work within 90 days, she should do so under the TRW program. The record is unclear as to whether Franqui contacted Dr. Shub as instructed; however, on October 23, 1994, Eric Hernandez, who had replaced Franqui as operations manager, sent a memorandum to plaintiff stating that the HCM Committee had requested additional information about her condition and instructing her to contact Dr. Shub for an appointment.

By the time Hernandez sent the memorandum, plaintiff had been involved in two more car accidents, which had worsened her physical condition and caused a recurrence of her depression, for which she had been rehospitalized until October 10, 1994. She did not revisit Dr. Shub for the requested second examination. Furthermore, in September 1994, on the advice of John Hancock, plaintiff had filed a claim with the Social Security Administration ("SSA"), which on October 15, 1994, informed her that she was entitled to Social Security disability benefits beginning August 1994. The SSA further informed plaintiff that it had been "determined that [her] period of disability began February 23, 1994," the date "[her] condition first prevented [her] from doing substantial gainful work." Franqui testified that plaintiff's position had been vacant since March 1993 and that the work load had "been distributed among 4 or 5" Federal Express employees.[2]

On September 26, 1995, plaintiff sued Federal Express under the ADA and Puerto Rico antidiscrimination laws. Following completion of discovery, the court granted Federal Express's motion for summary judgment, determining that plaintiff had failed to meet her burden of showing that she was a

---

1. In his deposition testimony, Dr. Shub clarified this language: plaintiff was not to perform cervical flexion "more than 25 times in a period of 25 to 30 minutes," or "more than one or 1.25 times per minute."

2. In June 1996, plaintiff requested that Federal Express extend her long-term disability benefits; the company extended them through March 31,

1997. Dr. Luigi discharged plaintiff from his care on December 16, 1996. At that time, she continued to suffer from pain in the cervical and trapezius areas. It appears from the record that, to date, plaintiff has not been terminated from her employment and continues to be a Federal Express employee on a leave of absence.

"qualified individual with a disability" under the ADA. The court also dismissed, without prejudice, plaintiff's claims under Puerto Rico law. Plaintiff appeals.

## II.

We review a grant of summary judgment *de novo*, viewing the record in a light most favorable to the non-moving party and "indulging all reasonable inferences in that party's favor." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). Although entry of summary judgment may be upheld only if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," *id.*, the party seeking to avoid summary judgment "must be able to point to specific, competent evidence to support his claim," *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 (1st Cir.1992). "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." *Id.*

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112. In addition to prohibiting adverse employment decisions, such as termination or denial of benefits, when such decisions are based on a qualified individual's actual or perceived disability, *see id.* §§ 12112(a), 12112(b)(3) & (4), the Act also prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* § 12112(b)(5)(A).

■ To establish a claim under the ADA, a plaintiff must prove by a preponderance of the evidence (1) that she was disabled within the meaning of the ADA; (2) that she was able to perform, with or without reasonable accommodation, the essential functions of her job; and (3) that the adverse employment decision was based in whole or in part on her disability. *See E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 141 n. 2 (1st Cir.1997); *Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir.1996). The second requirement—that a plaintiff be "qualified"—itself involves a two-part inquiry: the plaintiff must demonstrate both that she satisfies the prerequisites for the position, that is, that she has the proper training, skills, and experience, and that she could perform the essential functions of her job, either with or without reasonable accommodation. *See* 29 C.F.R. § 1630.2(m).

■ In this case, plaintiff and Federal Express do not dispute that, during the relevant period of time, plaintiff was a disabled person within the meaning of the ADA, that she satisfied the prerequisites for the position of operations agent, and that data entry and other clerical functions are the essential functions of that position.[3] They do, however, dispute whether plaintiff has demonstrated that there exists a genuine issue of material fact as to whether, at the time that she requested to return to work, she could perform the essential functions of her job.[4] Our evaluation of the record persuades us that she has not.

■ It is plaintiff's burden to prove that, at the time she sought to resume her job, she had the ability to perform the essential functions of an operations agent. Yet she has presented no "specific, competent evidence" to that effect, other than the pro forma medical releases she received from Dr. Luigi. Instead, she has concentrated on the argument that Federal Express also had an ADA-imposed burden: to be responsive to plaintiff's request for reasonable accommodation. She asserts that a trial is required to determine whether the company satisfied this burden when it rejected "out of hand" plaintiff's request for reasonable accommodation and did not "engage in meaningful discussion on the subject."

---

**3.** In determining what functions of plaintiff's job are "essential," we note that "consideration shall be given to the employer's judgment." 42 U.S.C. § 12111(8). Federal Express asserts, and plaintiff does not dispute, that plaintiff's data entry duties are the most important of her job functions.

**4.** Plaintiff does not contend that she could perform the essential functions of any job at Federal Express other than that of operations agent.

Plaintiff doubtless draws from the ADA's interpretive regulations, which state that determining an appropriate reasonable accommodation may require an employer "to initiate an informal, interactive process" with the individual seeking accommodation. 29 C.F.R. § 1630.2(*o*)(3). Indeed, we have held that "[t]here may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA." *Jacques,* 96 F.3d at 515. In so doing, we have cautioned that "cases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior." *Id.*

But in this case, plaintiff's assertion that Federal Express failed to engage in "meaningful" interaction with plaintiff regarding reasonable accommodation is of no moment— or, more precisely, it puts the cart well before the horse—because no reasonable trier of fact could have found, on this record, that plaintiff was capable of performing the duties of operations agent, with or without reasonable accommodation. At the times that plaintiff sought to return to work, in March and April 1994, she continued to receive long-term disability benefits. To be eligible to receive those payments, plaintiff was required to represent to John Hancock that she met the definition of "total disability," which, as described in a letter, dated December 8, 1993, to plaintiff from a John Hancock disability claims analyst, is "the inability because of a physical impairment, to engage in any substantially gainful activity for which [the claimant is] reasonably qualified (or could become reasonably qualified) on the basis of [the claimant's] education, training, or experience." In addition, on July 27, 1994, Dr. Luigi submitted to John Hancock, in response to its request that he update her condition, a completed "attending physician's report," presumably based on his examination of plaintiff on July 20—a date after plaintiff had represented to Federal Express that she was able to return to work. In the report, Dr. Luigi stated that plaintiff "needs disability at this moment; cannot work; still in medical care."

We have addressed in a prior case whether a disabled individual's representations (or those of her treating physician) regarding the extent of his or her disability, made in connection with an application for total disability benefits that extended through the point at which he or she sought to return to work, may have a preclusive effect on the individual's attempt to establish that he or she is qualified within the meaning of the ADA. *See August,* 981 F.2d at 580–83. In *August,* we determined that the plaintiff's application for total disability insurance, the benefits of which continued through the point at which he requested reinstatement, in combination with the fact that he had not demonstrated that he was capable of performing any work (even with a requested accommodation), eliminated any genuine issue as to his ability to work with reasonable accommodation.[5] *See id.; see also D'Aprile v. Fleet Servs. Corp.,* 92 F.3d 1, 5 (1st Cir.1996) (describing the holding in *August*). We did, however, indicate that, had the plaintiff "pointed to facts which could raise any issue as to whether he was totally disabled during the period in question," *August,* 981 F.2d at 583, he might have been able to establish a genuine issue as to his ability to perform the essential functions of his job.

The Seventh Circuit has similarly determined that, although a plaintiff "might have been deemed disabled under some other statutory or contractual framework," the plaintiff may counter any presumption that he or she is not a "qualified individual" by presenting "additional evidence that shows she could perform the essential duties of a desired position with or without reasonable accommodation." *Weigel v. Target Stores,* 122 F.3d 461, 468 (7th Cir.1997). The panel concluded that "absent some such affirmative showing of the plaintiff's ability to perform the essential functions of the position, there will be no genuine issue of material fact as to whether the plaintiff is a 'qualified individual' and the employer will be entitled to judg-

---

5. Although the record in *August* did not indicate how "total disability" was defined in the plaintiff's insurance policy, we nonetheless determined that "[u]nder any definition of the term,

August's declaration that he was 'totally disabled' means that he was not able to perform the essential functions of his job ... with or without reasonable accommodation." 981 F.2d at 581.

ment as a matter of law." *Id.* In other words, if an ADA plaintiff was receiving, during the time she claims to have been denied reasonable accommodation, total disability benefits that were predicated on her *inability* to perform the job, then, to defeat a motion for summary judgment, she must make some type of showing that she was in fact *able* to perform the essential functions of her job during the time in question. We think this reasoning is sound.

█ The record is bereft of any support for Soto's assertion that, at the relevant points in time, she was able to perform the essential functions of her position with reasonable accommodation. The evidence demonstrates only that plaintiff gave her supervisors two medical releases from Dr. Luigi: one appeared to state that her duties should be "light," and the other set forth a very sketchy list of requirements accompanied by a statement that plaintiff was still in need of medical treatment. Plaintiff presents no evidence to counter either Dr. Luigi's testimony that, at the times in question, plaintiff could probably not sit at a computer for more than thirty minutes, or Dr. Shub's testimony that data entry requires "continuous" cervical flexion, substantially more than the 1.25 times per minute permitted by her condition.

█ To be sure, the term "reasonable accommodation" may include "job restructuring [and] part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). However, the ADA does not require an employer "to reallocate job duties in order to change the essential function of a job." *Milton v.*

*Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir. 1995); *see Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 913 (7th Cir.1996) ("[R]easonable accommodation does not encompass reallocation of essential job functions."); *Fussell v. Georgia Ports Auth.,* 906 F.Supp. 1561, 1571 (S.D.Ga.1995) ("The law is clear that reallocation of job duties constitutes a change in the essential functions of [the employee's] job and [therefore] is not required under the ADA." (internal quotation marks omitted)), *aff'd,* 106 F.3d 417 (11th Cir.1997). But reallocating duties is precisely what Federal Express would have had to do in order to comply with plaintiff's request. Plaintiff's job required her to enter substantial amounts of data into a computer, which, according to plaintiff's own deposition testimony, required up to six to nine hours in a day. The time-sensitive nature of plaintiff's work meant that if plaintiff could not enter all of the data, the company would have had to allocate other employees to complete the work. Because reallocation of job functions exceeds the scope of reasonable accommodation, it follows that Federal Express was not required under the ADA to permit plaintiff to resume her job.[6]

Because we find that plaintiff failed to adduce evidence that she was a qualified individual with a disability within the meaning of the ADA, the district court's order granting summary judgment to defendant is *affirmed.*[7] *Costs to appellee.*

6. In light of our holding, we find meritless plaintiff's argument that, "if [her] functions could be distributed among the existing staff in her absence, they could have also been distributed while she worked four (4) hours a day, with reasonable accommodations."

Likewise, there is no merit to plaintiff's assertion that Federal Express violated the ADA simply by notifying her, five weeks after she submitted the second release from Dr. Luigi, that it would replace her because the second release indicated that she was incapable of fully performing the duties of her job. We note, however, that, even if plaintiff *had* satisfied her burden of showing she could perform the essential functions of her job, no reasonable trier of fact could find an ADA violation in the notification of termination because Federal Express eventually re-

sponded to plaintiff's subsequent request that she be examined by a physician designated by the company and that her case be referred to the HCM Committee.

Finally, we need not address the parties' dispute as to whether the TRW program was available to Federal Express's employees in Puerto Rico and whether Federal Express should have allowed plaintiff to participate in the program. Regardless whether the program was available to Puerto Rico employees, the fact remains that Federal Express's failure to allow plaintiff to work on a part-time basis did not constitute an ADA violation.

7. Accordingly, we also affirm the district court's dismissal, without prejudice, of plaintiff's claims under Puerto Rico law. *See* 28 U.S.C. § 1367(c)(3).